UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 7:16-CR-00876-9 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | McAllen, Texas |
| | ) | |
| RODRIGO ROMAN, | ) | Thursday, September 14, 2017 |
| | ) | |
| Defendant. | ) | (10:07 a.m. to 10:31 a.m.) |


SENTENCING

BEFORE THE HONORABLE RANDY CRANE,
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For Plaintiff:             PATRICIA PROFIT, ESQ.
                           Assistant United States Attorney
                           1701 W. Business Hwy. 83
                           Suite 600
                           McAllen, TX 78501

For Defendant:             STEPHEN F. HALL, ESQ.
                           Law Office of Damon M. Cheronis
                           140 S. Dearborn, Suite 411
                           Chicago, IL 60603

U.S. Probation:            Cris Corona

Court Interpreter:         Elena Medrano

Court Recorder:            Rick Rodriguez

Transcribed By:            Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, Texas 78480-8668
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**McAllen, Texas; Thursday, September 14, 2017; 10:07 a.m.**</u>

**(Call to Order)**

**(Official Interpreter Utilized for Translation)**

**THE COURT:** All right, next M-16-CR-876-9, *U.S.A. versus Rodrigo Roman.*

**MS. PROFIT:** The Government is present and ready.

**MR. HALL:** Good morning, Stephen Hall for Rodrigo Roman. He's present and ready.

**THE COURT:** All right. Mr. Roman, there was a presentence report prepared about you and your case as well. Did you get a chance to review this report with your lawyer?

**THE DEFENDANT:** Yes.

**THE COURT:** Do you have any questions about it that your lawyer could not answer?

**THE DEFENDANT:** No.

**THE COURT:** And was everything correct about you in the presentence report? Biographically, I know you may disagree with some of the facts attributed to you.

**THE DEFENDANT:** Yes.

**THE COURT:** All right. So here we also have the third acceptance point for responsibility. The Government would move for that?

**MS. PROFIT:** Yes, your Honor.

**THE COURT:** Which I grant.

Anything you'd like to add on your client's behalf?

1    **MR. HALL:**  Just to be clear, Judge, I think there was

2  no points for acceptance.  So it would not just be a third

3  additional.  It'd be the two plus the one.

4    **THE COURT:**  All right.  Did you submit an acceptance

5  letter?  I mean, why wasn't he given the --

6    **MR. HALL:**  I think through the plea and then also

7  through our sentencing memorandum, he very clearly accepted

8  responsibility.  I just had not sent in an acceptance letter to

9  the Probation office which would include the issue.

10    **THE COURT:**  Signed by your client.

11    **MR. HALL:**  Correct.

12    **THE COURT:**  I mean, he needs to -- if he's not going

13  to talk about it -- but since I know he did -- he met and

14  confessed his involvement in this to the Government, I'm going

15  to grant all three points off here this morning.  So what's

16  driving his sentence is the weapons.  You -- why don't we talk

17  about them together?  One is academic if he's held responsible

18  for the weapons that were found in his home.  Did you want to

19  argue that they were unrelated to this drug-trafficking

20  offense?

21    **MR. HALL:**  I absolutely do, Judge.

22    **THE COURT:**  I mean, I know it's --

23    **MR. HALL:**  Do you want to start with -- I think --

24    **THE COURT:**  The sawed-off shotgun or the one with the

25  silencer, which gun do you want to start with?

1          **MR. HALL:**  Well, the question that I have for your

2     Honor is I believe that the Government has suggested that he

3     may be safety valve eligible.  So would you like me to start

4     with the enhancement for the safety valve?

5          **THE COURT:**  Yes.  No, I --

6          **MS. PROFIT:**  We did meet with him.

7          **THE COURT:**  Yeah, he otherwise safety valve qualified

8     but for the weapon.

9          **MR. HALL:**  Okay.

10          **MS. PROFIT:**  Right.  We met with him.  We felt that

11     he was --

12          **THE COURT:**  Truthful.

13          **MS. PROFIT:**  -- truthful in terms of his involvement

14     and, you know, it -- we think that he was truthful.

15          **THE COURT:**  All right.  So, therefore, let's talk

16     about the weapon --

17          **MR. HALL:**  Yes, Judge.  So regarding --

18          **THE COURT:**  -- weapons.

19          **MR. HALL:**  -- the enhancement, obviously the two-

20     point enhancement brought under Sentencing Guideline Section

21     2D1.1 and I think what is important there is the notes

22     following 2D1.1 which -- and I'll quote the commentary.  "The

23          enhancement should be applied if the weapon is

24          present unless it is clearly improbable that the

25          weapon was connected to the offense.  For example,

1          the enhancement would not be applied to the Defendant

2          arrested at Defendant's residence, an unloaded

3          hunting rifle in the closet."

4     **THE COURT:**  All right.

5     **MR. HALL:**  Now, I'm not suggesting that the guns in

6  the safe were an unloaded hunting rifle although they were

7  unloaded.

8          I'd like to deal with the shotgun first.  It sounds

9  terrible to say that he had a sawed-off shotgun in his basement

10  but one thing that I think is very important with regard to

11  that shotgun is that it was, number one, unloaded and, number

12  two, there were no shells found anywhere in the house or around

13  the property for that gun.  In other words, that gun was

14  inoperable.  He could not have used it if he wanted to.  It

15  would not appear inoperable and from my understanding, it

16  actually appeared to be a rusted-out old sawed-off shotgun

17  although I've not seen pictures of it.  But I do think it was

18  very important to look at the idea that, well, it's not loaded.

19  That's one thing but if there aren't even shells for it

20  anywhere on the property, that's a whole other thing.

21          I mean, there is case law to suggest that, you know,

22  an unloaded firearm does not -- it's not dispositive of the

23  issue.  It doesn't bar the application but it doesn't

24  necessitate it either.  So I think that's a very important

25  point as to that shotgun.

1          With regard to the firearms that were located

2     upstairs in the office, they were, in terms of the house,

3     separated from the currency that was located on top of the

4     refrigerator on the main floor.  There were no drugs found

5     inside the house.  They were actually found in vehicles outside

6     the home.

7          But these two firearms, one of which counsel has

8     stated was given to my client by Mr. Omar Vasquez -- and I'll

9     talk about that relationship here in a moment -- they were

10    locked away in a safe.  Those two were unloaded.  There were

11    bullets for them in that safe but just speaking from

12    experience, when I have clients who are very clearly using

13    their weapons to protect their drugs or their money, they don't

14    lock them away in a safe upstairs with no bullets in them.

15         And to be clear, these are semiautomatic guns that

16    require a magazine to be loaded.  It's not simply putting

17    bullets in a revolver.  So it would take --

18         **THE COURT:**  Well, but the magazines are loaded.  It's

19    a matter of just sliding it in.  It's a one-step very quick and

20    easy.  It's not like a revolver where you're trying to stick

21    eight individual, I assume, right?

22         **MR. HALL:**  My understanding was that nothing was

23    loaded, that the bullets were in the box and that these guns

24    were completely unloaded.  That was my understanding and, you

25    know, correct me if I'm wrong.

1    **THE COURT:**  And he didn't have loaded magazines there

2   in the safe as well?  I mean, that would be typical.  That's

3   why I'm curious.  I'm trying to pull that up right now.

4    **MR. HALL:**  From the evidence I've seen, it doesn't

5   say one way or the other.  My understanding from reviewing the

6   evidence was that it was just completely unloaded and the

7   agents were pretty thorough.  I would have thought that I would

8   have seen that there were loaded magazines or something to that

9   effect in that same.

10   Judge, but from my perspective, you know, similar to

11   the shotgun in the basement that could not have been fired if

12   anyone wanted to or the firearms in the safe upstairs that were

13   locked away that were not loaded, they were not located next to

14   or near the currency and certainly not next to or near the

15   cocaine that was located in the vehicles out front.

16   It's very different from the situation that we

17   encounter where the person trying to protect their currency or

18   their drugs have a loaded weapon right next to them because

19   it's obvious that they are using that weapon for that purpose.

20   Mr. Roman has indicted to me at least that he was truly using

21   that firearm for home defense and not in the sense of defending

22   the currency or the cocaine but because he lived in a very

23   high-crime area with a lot of gangs.

24   I did pull some *Chicago Tribune* articles from around

25   the time that Mr. Roman was arrested that indicate that stray

1  bullets killed a boy a block from Mr. Roman's house.  The FBI

2  did a massive raid in the Melrose Park neighborhood that summer

3  and arrested 34 Latin King members.  In sum, the gang violence

4  was extreme and he was worried about his family, not the

5  currency that other people were giving him.

6         So to that extent, I would liken to the --

7  essentially the carve-out in Section 2D1.1 where the unloaded

8  hunting rifle in the residence should not be considered.

9         **THE COURT:**  All right.  I'm still trying to pull up

10  the paragraph that describes the weapons.  Whose PSI was this?

11  Ms. Corona, you again?  The weapon paragraph --

12         **MR. HALL:**  Judge, I can actually tender to your Honor

13  for review the agent's notes on this matter if there's no

14  objections.

15         **THE COURT:**  Well, the Probation office will put

16  together multiple agents' notes.  I mean -- or they may even

17  just have seen a picture and use that as their source.  So I

18  don't know --

19         **U.S. PROBATION OFFICER CORONA:**  In this case, your

20  Honor, aside from the discovery, it was my interview with the

21  agent from Chicago who was actually there for the seizure,

22  Agent Cantapalips (phonetic) --

23         **THE COURT:**  Uh-huh.

24         **U.S. PROBATION OFFICER CORONA:**  -- who advised me of

25  the types of weapons and that there was ammunition there.

1          **MR. HALL:**  And we're certainly not disputing that

2     there was Type 380 ammunition for the guns in the safe.

3          **THE COURT:**  Now, he lived in the home with his wife

4     and small children as well, correct?

5          **MR. HALL:**  Correct.

6          **THE COURT:**  Which, again, is important that these

7     guns were locked away.

8          **U.S. PROBATION OFFICER CORONA:**  It was Paragraph 55,

9     your Honor.

10          **THE COURT:**  Okay.

11          **MR. HALL:**  Is that the revised?

12          **THE COURT:**  I'm only looking at the revised.  I don't

13     get access to any -- that's not true.  I don't get access to

14     all prior presentence reports but I always look at the latest

15     one.  It doesn't really speak of any -- it doesn't even address

16     the ammunition.  But I -- again, you say it was there.  I mean,

17     it was there.  It's in a safe because you have kids but these

18     are tools of the trade, like you said, or used to defend the

19     house.  Well, they're used to defend the house because the

20     house has bulk currency.  Let's see, there was $400,000 on this

21     occasion -- $399,850.

22          **MR. HALL:**  I believe the --

23          **THE COURT:**  That was in the --

24          **MR. HALL:**  -- amount from his home was a little over

25     $40,000.

1          **MS. PROFIT:**  This was -- no, this was not the massive

2    money amount, your Honor.

3          **THE COURT:**  Okay.  This was --

4          **MS. PROFIT:**  The 399,850 had been taken in February

5    3rd, 2011.

6          **THE COURT:**  So this was a much --

7          **MS. PROFIT:**  A much smaller amount of money that was

8    recovered at that time.

9          **THE COURT:**  What was his address?  Was he the North

10   Memorial address?

11         **MR. HALL:**  He was on the North 33rd Street in Melrose

12   Park, Judge.

13         **THE COURT:**  North 33rd Street.

14         **MS. PROFIT:**  There was more that was found with Jose

15   and Moises, your Honor.  It was a large duffle bag of cash that

16   was found with them.

17         **THE COURT:**  All right, I see that.  That's --

18         **MR. HALL:**  And so, Judge, just to reiterate the

19   point, there is good Fifth Circuit case law that says that it's

20   not a dispositive matter if the gun is unloaded and obviously

21   the converse of that would be true.  It's not a mandate that

22   you find this enhancement applies because the gun is loaded or

23   not loaded.

24         **THE COURT:**  I mean, the guns are -- I told you

25   they're presumed to -- if they're in their possession, presumed

1    to be used in connection with these drug-trafficking activities

2    and I've just -- I don't -- I find you have not overcome that

3    presumption.  I believe that these weapons loaded and unloaded

4    with ammunition, without were being used for facilitation of

5    drug-trafficking activities, including the defense of these

6    drugs and drug proceeds that were commonly at the residence.

7    So that's how I come out factually on that.

8            **MR. HALL:**  So as to the enhancement, would your

9    Honor's application of that come out the same for the safety

10   valve eligibility?

11           **THE COURT:**  Yeah, that he -- no, that he actually

12   possessed them.  So he's disqualified from safety valve as a

13   consequence of my finding.

14           **MS. PROFIT:**  I think that -- then that that may bring

15   the question of how they came to be with him.

16           **MR. HALL:**  And, Judge, I appreciate that point.  It

17   is important that as Ms. Profit pointed out earlier, it's my

18   understanding that both the shotgun and at least the firearm

19   and silencer were given to him by Mr. Omar Vasquez and he was

20   told to hold on to them, Judge.

21           As to the other firearm, that was a validly

22   registered, owned firearm in the state of Illinois and

23   different than many states, in Illinois, you have to actually

24   apply with the Illinois State Police Firearms Services Bureau

25   for a -- they call them a "FOI card," Firearm Owner's

1    Identification card.  So they do a background check on you.

2    They vet you.  They determine whether they think you should be

3    eligible to own a firearm and then when you do purchase a

4    firearm, you must register it with the Illinois State Police.

5         THE COURT:  And this was registered to him?

6         MR. HALL:  So the one firearm that he had that was

7    legal that was not given to him by someone else, the one that

8    he purchased for his home defense that was unloaded inside the

9    safe was registered with the Illinois State Police.  It was a

10   valid firearm that he was lawfully entitled to own.  Again --

11   and I hate to belabor the point but I don't have a lot of

12   clients that have drugs and money and valid firearms that they

13   keep in a safe unloaded, you know, that then connected with

14   those drugs or that currency.

15        THE COURT:  I'm not following you.  I mean, I think

16   they are connected.  They happen to have been in the safe at

17   the time because he's not leaving them laying around in a home

18   with children who would have access to them but it is not

19   uncommon that the Court sees people who are -- who have

20   permission and valid permits legally carrying the weapons that

21   they have and involved in drug trafficking.  I mean, it's --

22   just because he went through a legal means of getting the

23   weapon doesn't mean that it was not being used for illegal

24   purposes, you know.  And that's a non sequitur to me.  I don't

25   -- is that what you were sort of implying is why would somebody

1 validly buy a gun and then use it for illegal purposes?

2       **MR. HALL:** Yeah, I guess, Judge. I think that in

3 part you are -- especially in Illinois, especially in Chicago,

4 you are drawing attention to yourself in the fact you own

5 firearms.

6       **THE COURT:** Well, it's fairly -- down here it's

7 pretty common. People go to Academy and buy assault weapons

8 and then use them in drug-trafficking crimes.

9       **MR. HALL:** Absolutely but I'd have to, you know,

10 respectfully say that it's a very, very different situation in

11 Chicago. Gun ownership is extremely strict up there,

12 especially within the city limits. And so if anything,

13 Mr. Roman is drawing more attention to himself by having a

14 legal, valid firearm than anything else. That seems to me to

15 be opposite of what you want to do if you are going to be

16 trafficking.

17       **THE COURT:** I agree and I scratch my head how he got

18 one given his arrest for mob action and ag assault but, I mean,

19 I don't know how strict the vetting process is.

20       **MR. HALL:** I think they looked at convictions, not

21 the -- not dismissals, Judge.

22       **THE COURT:** So he had no criminal convictions and was

23 able to get one. That doesn't sound like a very strict

24 requirement. Is -- I don't see that there's anything more than

25 what's required by the Federal regulations, I mean, if that's

1    all Chicago requires is that you have no convictions?

2         **MR. HALL:**  You know, I couldn't state to exactly what

3    the Illinois State Police does to vet but I do know that it is

4    relatively strict requirement and that's why most people don't

5    have FOI cards -- or that's one reason perhaps why most people

6    don't have FOI cards.  But, again, I would point your Honor

7    also to the other -- and I think it's a very valid reason for

8    him to have the valid firearm that he did have which is the

9    gang violence in the neighborhood.

10        Only a couple of months after he was arrested, a boy

11   was shot by stray bullets from gang gunfire and killed a block

12   from his home.  Mr. Roman had two windows shot out of his house

13   in the upstairs unrelated to anything in this case.  It was

14   stray bullets from gang gunfire.  There are numerous -- dozens

15   of Latin King and other gang member arrests in the same

16   neighborhood during the same time period and I think it is a

17   perfectly legitimate reason when Mr. Roman says they use them

18   for self-defense that he means the gang violence in the

19   neighborhood, not the money above his refrigerator.

20        **THE COURT:**  All right.  And I have no doubt he used

21   it for his defense against potential criminal elements in the

22   neighborhood as well but I also believe that they were -- he

23   had them because he was involved in drug trafficking, two of

24   them having been gifted to him by Omar Vasquez, a Co-defendant

25   with whom he was involved in drug trafficking and, again,

1  they're presumed to be and I do not believe that you have

2  overcome that presumption.

3        **MS. PROFIT:**  I'm not sure if he would characterize it

4  as it was gifted to him.  I think that they're -- I'm just

5  saying that --

6        **THE COURT:**  Or lent to him, whatever, he was holding

7  them for him.

8        **MS. PROFIT:**  Because I don't want that to -- I'm

9  saying that I think that he was asked to hold it which is

10 different than being gifted to him --

11       **MR. HALL:**  Right.

12       **MS. PROFIT:**  -- or actually given to him for his

13 possession.  And certainly he probably regrets that he agreed

14 to do it at this point in time, you know.  I mean, I'm just

15 saying that, you know --

16       **MR. HALL:**  Certainly.  And, Judge, that is a good

17 characterization that I appreciate being made.  He was not

18 intending to keep these forever.  The understanding was that he

19 would be giving them back at some point with the exception of

20 the valid firearm.

21       **THE COURT:**  All right.  I mean, again, unfortunate

22 that he made these choices given his extensive drug-trafficking

23 activities and that these weapons are tools of the trade and

24 the presumption they were being used in connection therewith

25 and all the circumstances surrounding these events, I believe

1  it is more likely than not they were connected to drug-

2  trafficking activities and secondarily the defense of his home

3  from the Latin Kings in the neighborhood.

4          All right.  So your objection is noted.  I just

5  factually find against you on this which obviously does affect

6  his sentence although not significantly.  It's a 12-month

7  difference in his sentence.

8          Mr. Roman, you get to speak this morning as well.  If

9  there's anything you'd like for me to consider, now is your

10 chance to speak.

11         **THE DEFENDANT:**  Yes, your Honor.  Before anything

12 else, I want to apologize.  I want to say I'm remorseful.  I

13 know what I did was wrong.  I never thought of the magnitude of

14 this.  I'm remorseful for my actions.  I feel guilty of what

15 I'm being charged for.  I'm remorseful.  I really miss my

16 family.  I have not seen them in one and the truth is I feel

17 guilty and I know I have to pay for this.  I ask you to

18 consider that I have a good record.  I was never in trouble.  I

19 don't have any criminal record, no domestic violence record, no

20 gang affiliations.  I've been a good member of my community.  I

21 go to church.  I don't know whether the Court read the letters

22 that my pastor wrote.  I ask you to consider all this.

23         **THE COURT:**  I did review all the letters that were

24 submitted on your behalf and, again, as is common, you know,

25 you seem to have two complete different sides of yourself, you

1  know, one obviously involved in -- heavily in drug trafficking

2  and then you have your normal, sort of family life that you're

3  able to maintain at the same time and I guess those are the

4  witnesses who sent in letters were those who saw only that side

5  of your life.

6          And I did misspeak a moment ago.  It's not a 12-month

7  difference.  It's a 33-month difference, his lack of qualifying

8  for safety valve because then he would have gotten the two

9  points off.  I forgot to account for that a moment ago.

10          Does the Government have anything they want to add?

11          **MS. PROFIT:**  The Defendant was very truthful when we

12  met with him and in terms of his truthfulness and stuff, I

13  think he was impressive in his sincerity in terms of how he had

14  involved himself in this and there were regrets that he had for

15  involving himself in this but he was very easy to deal with

16  which considering that we've had so many individuals that have

17  not been easy to deal with, this is something that the

18  Government appreciates, his veracity, his truthfulness and his

19  honesty.

20          **THE COURT:**  All right.  I'll consider that.  The

21  Court adopts the factual findings contained within the

22  Presentence Report.  I find it correctly scored.  However, I do

23  grant all three points off for acceptance.  That drops him to a

24  31 which would be a range of 108 to 135 but for the mandatory

25  minimum, the actual range is 120 and 135 months and given that

1   he has no criminal history.  I considered those factors under

2   18 U.S.C. 3553(a) and conclude that a sentence within these

3   guidelines satisfies them and, therefore, pursuant to The

4   Sentencing Reform Act of 1984, it is the judgment of the Court

5   the Defendant is committed to the custody of the Bureau of

6   Prisons to be in prison for a term of 120 months and I'm going

7   on the low end because of what the Government mentioned about

8   Mr. Roman.

9           Upon release from imprisonment, the Defendant is

10  placed on supervision for five years which is also mandatory

11  and while on supervision, the Defendant is not commit any

12  Federal, State or local crimes.  He is to comply with the

13  standard conditions adopted by this Court and abide by any

14  mandatory conditions required by law.  In addition, he's not to

15  possess a firearm or destructive device.  He is to cooperate in

16  providing a DNA sample.  If deported during supervision -- I'm

17  sorry.  He's a U.S. citizen, I have here, right?

18          **MR. HALL:**  Yes, Judge.

19          **THE COURT:**  So I find the Defendant can no longer

20  afford to pay a fine.  So I waive the fine in this case but he

21  is assessed a 100-dollar special assessment which is payable

22  immediately.  Are there any special programming needs that he

23  needs?

24          **MR. HALL:**  Your Honor, you were addressing the

25  Government, but Mr. Roman does have some health concerns that

1   are addressed in the PSI and so just -- I would request that he

2   be sent to a facility somewhere near the city of Chicago, to

3   the best you can recommend that.  It also has some programs

4   that can address those healthcare needs.

5           **THE COURT:**  All right.  I was curious more whether he

6   had a substance abuse issue.

7           **U.S. PROBATION OFFICER CORONA:**  No, your Honor, just

8   maybe possibly an educational program.  I know he did --

9           **THE COURT:**  All right.  So I'll recommend that he be

10  placed in a facility closest to his home in the Chicago area.

11          **MR. HALL:**  We'd also ask for the residential drug

12  treatment program.

13          **THE COURT:**  All right.  I mean, that's what I was

14  sort of inquiring of.  The Court will recommend also that he be

15  placed in a facility where he can receive the benefit of the

16  RDAP program.

17          This is your sentence, Mr. Roman.  You can appeal it.

18  You have two weeks to do so.  If you cannot afford the cost of

19  an appeal, you could ask that I waive these costs of an appeal.

20          Are there remaining counts?

21          **MS. PROFIT:**  The Government would move -- I don't

22  think the Government -- there is no remaining counts.  It think

23  he just was one count.

24          **THE COURT:**  All right.  To the extent there were any

25  other counts, just to be safe, the Court dismisses them at this

1    time.

2              All right.  So, Mr. Roman, hopefully you'll be placed

3    in a facility back in the area of your family.  If you complete

4    this program -- this drug program, it will take a year off of

5    your sentence and it will also mean that the last six months of

6    your sentence will be in a halfway house or in home

7    confinement, depending on bed space primarily.  And so I hope

8    you'll take that program seriously as it'll benefit you

9    substantially.  Best of luck to you, sir, and you're excused at

10   this time.

11             **MR. HALL:**  Thank you, Judge.

12             **THE COURT:**  All right.

13         **(This proceeding adjourned at 10:31 a.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          October 25, 2017

                  Signed                                    Dated


                    *TONI HUDSON, TRANSCRIBER*